May it please the court, I'm Carl Schusterman representing the appellants. I'll keep track of my time and I'd like to reserve eight minutes for my co-counsel Nancy Miller to do a rebuttal. So you're going to do the opening and she's going to do the rebuttal? Exactly. Okay, that works. The Child Status Protection Act was enacted by Congress in order to keep nuclear families together in the face of waiting times in the immigration system that can exceed 20 years. This court should follow its precedent in Padash v. INS and the Fifth Circuit in Kali v. Holder and read the statute as clear and not bring in any meanings or restrictions from regulations or other areas that aren't actually written into the statute. What I'd like to do is talk about four issues that I think are paramount in this case. The first one is that the legislative language is clear and unambiguous and under those circumstances there's no need for this court to defer to the administrative agency decision that's been rendered in this matter. Secondly, the agency took words like retention and automatic conversion and cited two prior regulations and said this is the way the terms have always been interpreted. We disagree with that and we urge the court not to interpret it according to some kind of term of art which would make Section H3, I should say 8 U.S.C. 1153 H3, practically meaningless. Mr. Schusterman, I'm a little puzzled. You say that this is unambiguous as indeed does the Second and the Fifth Circuit and yet they come to entirely different conclusions. I think that is a result. I should distinguish matter of lang only found one ambiguity and that the ambiguity was do Sections H1 and H3 apply to the same petitions and on that there was complete agreement. Let me explain what I'm talking about here. In the Second Circuit in Lee, they found that H3 was plain, unambiguous and yet that it plainly excluded all derivative beneficiaries where they were aged out under F3 and F4 and that's Lee. Whereas the Fifth Circuit said it was unambiguous, plainly includes all those people. Now, we may have differences with our fellow, our sister circuits from time to time but as to whether there is ambiguity, doesn't that pate league show that some very smart people from other circuits have looked at this and they can't make up their minds. The language can't be all that clear. No, Your Honor. I have to disagree with that. Tell me why. Because in matter of lang, there's only one ambiguity that the Board of Immigration. I'm not talking about lang. That's a different issue. That's what the administrative agency said. I'm asking you about these two cases that the Second and the Fifth Circuit decided wherein they both said that the statute, not the administrative case, that the statute was clear and unambiguous on its face and yet they came to entirely different conclusions. The second saying that the F3 and F4 derivative beneficiaries were excluded under the plain language of the statute, whereas in the Fifth Circuit, looking at this unambiguous statute under Khalid, they say they're all included. Doesn't that show on its face that this statute is unclear, it's ambiguous at least to the extent of what do you do with these F3, F4 petitioners where at the very least there is no category into which they can be converted and secondly, you have to have a new petition if they're going to be for a niece, a nephew or a grandchild. How is it not ambiguous? Because the Second Circuit is in error in adopting the fact that, or not the fact, but the conclusion that retention and automatic conversion are not to be given no usual meaning. Instead they interpret them as terms of art, which is clearly erroneous. That's what you do in the statute though, isn't it? I grant you, the administrative law is really kind of a mess, but the reality is that you look back and forth, it's almost like the Internal Revenue Code. You've got this section refers to that section, refers to the other section, and they amend things. And the reality is that it's very clear that if you're going to have people in a certain degree of consequency, you can't have a derivative relationship, you have to have a new petition. You also have to have a category into which it goes. And the problem here is that this statute, whatever Congress intended, and we don't know, does not provide for that. And that you have these two circuits, two very fine circuits, that come to entirely different conclusions based upon what they say is an unambiguous statute. How can we conclude otherwise than that there's some ambiguity here when these two circuits came to entirely different perspectives? I think Khalid in the Fifth Circuit had it right that if you take those words, retention and automatic conversion, and you give them their common meaning instead of some meaning that is imputed, not written into the statute, it is clear. And where the Second Circuit made their mistake is they adopt these artificial arguments that retention can only involve one petitioner, thereby disregarding many, many other regulations. But you're just saying you don't like the results in one of the cases. But it doesn't change the fact that they both say that it's unambiguous, and yet they come to different results. That's my focus here. But isn't, Your Honor, respectfully, isn't it the function of the Court to look at the language of Congress rather than imposing artificial meanings? Well, you're the one relying on the lack of ambiguity, and you cite other circuits. So I think it's a perfectly fair question, which you have yet to answer. How can we conclude that the language is unambiguous when two other circuits have looked at the same language and come to diametrically opposite conclusions as to what it means? It's a simple question. You may not have a good answer, but talk about other things. Disparaging the question is not going to advance your case at all. Well, it's just plain wrong that retention always means there's one petitioner. The word retention means you keep a benefit. It doesn't mean there's always one petitioner. If you take that unwritten assumption that... Well, the statute says the alien shall retain the original priority date, period. Yes. Yes. But you can't retain... because there's plenty of regulations that the INS has promulgated where there's multiple petitioners. That's possible. That's a possible way of reading the word. But why isn't the way that the Second Circuit read it also a possible way of reading it? Because the Second Circuit says that retention always means that there's only one petitioner, and there's regulations, ACFR 204.5e, where when you change from one employer and that employer maybe goes out of business and you go to a second employer, you retain the earlier priority date even though you're petitioned by the second employer. So there's numerous examples that we've brought up in our briefs where there are more than one petitioner and the person still retains. That was the mistake that the Second Circuit made. There really is... I'm not at all sure how that helps you. The fact that you can find situations where the word is used differently than used by the Second Circuit doesn't make the Second Circuit's interpretation plausible. I mean, that's the way English words work. Sometimes you can give lots of examples where a word means one thing, and then that doesn't negate the fact that it also means other things in other contexts. So, you know, I don't know how any of that helps you. But doesn't the Court start with the clear meaning of the statute instead of taking unwritten assumptions about what different words mean? No. I think the Court looks at the statute and sees whether the meaning is clear, and when it finds that there are different possible interpretations of the statute, then it concludes it's unclear and then defers to the agency. Well, you know, it's clear to me, crystal clear to me, what this language states. And they just got it wrong, the Second Circuit. I agree, Your Honor. I think to go to what you asked, Judge Kosinski, the statute... Judge, you just misquestioned it. I thought it was a good question for which I kept waiting an answer. Okay, well, hopefully this won't be the answer you've been waiting for. Yeah, so, I mean, the answer is we don't read, just because the immigration law is so poorly written and convoluted and amended from time to time in terribly crazy ways, just because of that we don't apply any other different rules of statutory construction Right. It's not a special code of new rules of statutory construction. We apply the same ordinary meaning to these words, the words retention, the words automatic. Isn't that your answer? That is exactly my answer. What are the rules of statutory construction that we should be applying here to get to the result that you're arguing for? Your Honor, I think just reading the common usage of these words and not taking these restricted, unwritten meanings... Let's take automatic. Why can't automatic mean? Automatic means it happens at once and not that you have to wait for a second petition to be drafted and prepared weeks, months, sometimes years later. Automatic means it happens instantly. Why isn't that a plausible meaning of the word automatic? I agree with you. I think that instantly, though, means instantly when the parent becomes a permanent resident, that child is entitled to the appropriate category. But there's no petition at that point to which the conversion can apply. Right. The parent, once the parent becomes permanent resident, the parent has to file a new petition. So the process can't happen as soon as the parent becomes a permanent resident. There has to be a new application filed and a new process to actually get the parent paperwork to become a permanent resident and to file an application. I think the agency can actually go either way and procedurally, which probably doesn't require the court to enter into it, require a new petition or not require a new petition. Well, let's just say hypothetically that you were correct. What do you do about nieces, nephews, or grandchildren? They're not included by the statute. How do you take care of them? Because the statute makes clear that the relationship is these of the principal beneficiary, which is the parent, not with the grandfather or niece. So you're saying that the word automatic here overrides another express provision of the statute that bars treatment of nieces, nephews, and grandchildren in this same category. No, there are no categories. I agree with you. There are no categories, but I don't think the statute says that at all. They're showing that they don't want to break up the nuclear family, and when that parent becomes a permanent resident, the child falls within the category, the 2B category, as the unmarried son or daughter of that permanent resident parent. That's the purpose of the statute, is to keep families together. Let's assume that my— Would you answer? Yes. Judge Pragerson, I totally agree that that's the purpose, and using these restricted definitions really emasculates all the benefits that H-3 provides. It should provide— But what about this argument that we hear about people, you know, after they get 20, reach 21 years of age, they jump the queue? Yes. And, again, nobody under the CISPA ever jumps the queue. They're only given credit for the time they spent waiting in line, and that's true with H-1, which the government— There's another line here. There are people who are waiting under the new category, and they're about to get their visa, and then these folks jump into line in front of them. So, you know, it's sort of a zero-sum game. You keep some families together, and you keep other families apart. There are only so many visas. So it's hard to say that this is going to increase family unity, because if your clients don't get a visa, the next person in line who also has a family here will get a visa. Isn't that right? If that person— Is that right? No, that is wrong, Your Honor. I respectfully disagree with that. Well, then set me straight, because I'm pretty sure that it is right. Because only—everyone gets credit for the time they spend in line, so the people— Well, there are people in line who don't get credit because they were never in that situation, who were children of permanent residents to begin with. But they have already been waiting in line, so— And they're waiting in line, and then somebody gets converted according to this provision, and they step ahead of them. So the visa that that person would have gotten goes to your client, right? No, Your Honor, I have to disagree. I mean, immigration law has been very consistent for the last 50 years about this waiting in line issue. Well, forget about consistency. Explain to me why I'm wrong about that. Because who has waited in line longer? The person who got petitioned—their parents were petitioned when they were two years old. They were in a 23-year line. Once they turned 21, they were no longer qualified under H-1 after the subtraction formula. So they have that 20-year wait, and you're comparing it with somebody who just applied or maybe applied five years ago for their child. We don't know how long ago they applied, but that person would then get the visa, however long they waited. And if you win, your clients step ahead of them and get the visa first. The person who— Is that right or not? No, that is not. Well, you keep saying that, but you keep— Your Honor, I'm trying to explain that. Whoever has been standing in line longest gets the visa first. But that's not the question I asked. The question I asked is, if your clients don't get the conversion, and somebody is about to get a visa, it's next in the queue. Right. Okay. If your client gets converted in, then that visa, the next visa, will go to your clients and not to that person. If they've been waiting in line longer, yes. Okay. So the answer is yes. Right. Okay. So what you do is you have one family united. You have another family, you know, somebody else steps back and has to wait longer. So this is sort of a zero-sum game. Right. Yes? Yes? It's zero-sum in the sense that SISPA doesn't increase the total number of visas. That's what zero-sum means is you don't increase the number of visas, and what you're doing is favoring this family over another family who also had a waiting period. That's all it does. But no one with a shorter waiting period under the Automatic Conversion Clause ever steps ahead of somebody who's been waiting longer. That never happens. Well, that depends on what line you're talking about. You're saying it doesn't matter what line the immigrants are in. As long as they're in some line, the waiting time, the longest waiting time should prevail. Is that your position? Right. That is what Congress is saying in H-3. When you say that that's what Congress is saying, let's go back to the one, the hypothetical, but my colleague Judge Pregerson made the point that the purpose of this act is to keep families united. But frankly, it's a mess. It's not well drafted. So what are we to do if we have a statute that has laudable goals but it is just a mess? Are we to legislate? Are we to decide how we're going to fix this mess? I know we can legislate interstitially, but if the statute is not clear and you get all these disparate results from different circuits, unless, of course, the Supreme Court can decide it, what are we to do? I mean, as I'm looking at it here, I don't see how this works. I honestly don't see how it works. I love to keep families together. I have a lot of kids. I think families are great. But I write this bill. I have to look at the bill and I have to say, okay, Congress didn't make this clear. It's just not clear. So how do we deal with it? Don't we have to go to a Chevron situation here and say, well, let's look at the agency that is the specialist in this area. They look at this. They've made a determination. If it's reasonable, then we have to defer to them. Isn't that where we are? Your Honor, number one, I think it is clear. Number two, I think that if this Court does go to Chevron Step 2, the agency's interpretation is clearly unreasonable and should not be deferred to. Is that your preferred position, that Wang is just wrong or that the statute is unambiguous? Both. I don't think we have to reach, the Court has to reach Chevron Step 2. But I'm saying hypothetically, if it did, Wang is clearly wrong. You don't find that? I mean, Wang misinterprets the legislative history. They said it only applies to administrative delays. That's obviously untrue. They disregard Senator Feinstein's statement. They disregard Section 6. Obviously, there are members of the Supreme Court who find no value in legislative history, but almost no one finds value in the statements of individual senators or congressmen. So where is this legislative history, this definitive history to which we're supposed to make reference? The BIA thought so because they cited Sensenbrenner and others. Before we run out of time, can you address the derivative beneficiary regulation that Wang said the statute was simply intended to codify? Why is that wrong? The derivative beneficiary regulation? Yeah, the CFR, what is it, somebody? 204.2? Yes, well, for, you know, the one that says the child will be accorded second preference. If the child reaches the age of 21 prior to the issuance of a visa to the principal alien parent, a separate petition will be required. In such case, the original priority date will be retained if the subsequent petition is filed by the same petitioner. Such retention of priority date, isn't that the one that Wang said, that's all that the statute was intended to codify? Right, and that statute expressly used the words, as you said, if a subsequent petition was filed by the same petitioner. Now, if the Congress wanted that definition of retention to apply to the statute, I assume Congress would have used the words filed by the same petitioner. But Congress did not use those words. Let me ask you to make sure I understand this. The regulation that this statute may be seen as codifying required the filing of a new petition? That is correct, Your Honor. So if we're trying to figure out what automatic means, both sides of the aisle here appear to say that automatic includes the filing of a new petition. This is an answer to Judge Kaczynski's question earlier. Do you follow me? No. Judge Kaczynski asked whether it was automatic or consistent with the definition of the word automatic that a new petition had to be filed. Well, I gather the government's position is that we've just codified that regulation, and that regulation itself required the filing of a new petition. Therefore, it seems to me we have no examples of something that's automatic without the filing of a new petition. Is that correct? There are examples where there can be an automatic conversion without filing a new petition, but those are in the regulations, and the statute didn't follow the regulatory language, so I don't think that this Court is bound to interpret it that way. Counsel, can you discuss impracticability, the issue of impracticability? Yes, I think that the panel decision in this case that said it's clear what statute, I mean what petitions that H-3 applies to but it would lead to absurd results is conditioned upon one error, and that error is accepting these restrictive definitions of retention and automatic conversion. If we take the regular dictionary terms of retention and conversion and say it can be multiple petitions, it can be multiple petitioners, then it doesn't lead to absurd results at all. It leads to very clear results. And the result that Congress wanted was that all derivatives of family-based petitions, employment-based petitions, and diversity lottery petitions would benefit equally in H-3 as they do in H-1. Counsel, if we went the way that the government urges us to go to, would the person and the people in the third and fourth categories be subject to deportation while they refiled their petitions? Well, a lot of the people in at least our plaintiffs are outside the country, so of course they wouldn't be subject. If they were inside the country, would they be subject to deportation while they waited 20 more years to get? If they were not in legal status, absolutely, yes. But that's true of anyone that's not in legal status. Right. Anyone who's not in legal status, you're correct, yes. Okay. Did you want to reserve time for your panel? Yes. I would like to reserve the rest of the time for my colleagues in the rebuttal. Thank you. Okay. We'll hear from the government. Thank you. Good morning. My name is Gisela Westwater, and I'm here on behalf of the defendants' appellees in these consolidated cases. Plaintiffs' appellants have tried to paint their interpretation as a provision that brings families together, that unifies families. However, this is really a misnomer. This is not what plaintiffs' interpretation would do. F3 and F4 beneficiaries account for just a little more than a third of family preference aliens. They don't account for aliens who immigrate on immediate relative petitions, doesn't account for employment petitions, doesn't account for the asylees and refugees who adjust status. All of those other categories of aliens don't have 20-year-old priority dates to give to their adult sons and daughters when they immigrate. They immigrate, they file their petitions, they get a day that they think means something as a priority date. The plaintiffs will take all that away from them, all that transparency by saying aliens who had a petition filed for them 20 years ago, maybe aged out within one day, will get credit for the time, not that they waited that one day in line, the day their parents waited. Well, isn't that true? I mean, if it were one day before, two days before, that scenario would still apply? I'm not sure. Your Honor, we can take the category of What if it's 20 years and 11 months? They're still going to step in front of No, Your Honor, because those aliens will be coming in as derivative beneficiaries of an F3 or an F4 petition. They will come in in the F3 category. They will not be displacing anybody in the F2B category. So therefore, you have a lawful permanent resident who's been here 10 years, does not have an old cat, is not an F3 or F4, came as an IR, maybe came through legalization, which does not allow So legalization and SAW did not allow derivative beneficiaries, even if they were minors, right? So those aliens come to the United States, they file petitions, the day they are here is the earliest day that they're going to get for their children, right? I'm trying to understand, forgive me, these categories, but there is a category into which these derivative beneficiaries fit, and if they don't age out, they will get the benefit of whenever the petitioner from whom they are derivative filed their application.  Yes, Your Honor. If a month passes 30 days and they are now over 21, they are removed from that position and put into a new line. Is that correct? A new category. But if everything happened where they would be qualified and so that they could get their visa, when they are just before they turn 21, they would displace other people waiting for visas, would they not? No, Your Honor. If they continue to remain as derivatives, they will continue to remain in their parent's category. So if the parent is an F4, the derivative who stays in F4 will come in the F4 category, will not displace sons and daughters of lawful permanent residents, will displace other aliens in the F4 line where this alien has been for perhaps 20 years and 11 months. But in the category of an F2A, so this is a person who is already a minor child of a lawful permanent resident, when that person ages out, under regulation already, that alien was already, prior to the CSPA, entitled to move to the F2B category and keep that priority date, it just needed a new petition. Are you saying that the statute does nothing more than to codify what was already done under the regulation? That's what the BIA seems to say. No, not exactly. It says codified plus. And what's the plus? The plus is no second petition. That's what conversion means. Now, plaintiff keeps saying, get this great dictionary out and tell us what automatic conversion means without looking at how Congress or the BIA or the, I'm sorry, the INS, now the DHS, used it in the past. You can't do that. So you're saying that in terms of practical consequence, the only thing the statute does is to codify what was already in the regulation and it eliminates a little bit of paperwork? Yes, Your Honor. And so it went through all of this amendment for only this one purpose? That's how it was supposed to read the statute? Yes, Your Honor. Since 1965, all other automatic conversions, so category changes from category to category, could take place without a second petition. So why does Congress go to the trouble of passing a statute to accomplish nothing except elimination of a piece of paper that the agency could have done? The agency could have dispensed with the filing of the sample piece of paper. Well, it's not so easy for the agency because some cases, such as the aged-out derivatives of an F2A, were never primary beneficiaries of a petition in their own right. So this was a big step for the agency to have taken on their own and to implement something. But I think you just told me the agency already did it as a practical matter. The only question is paperwork.  Yes, Your Honor. And so the agency did not have the power to dispense with the paperwork. They had always required a second petition. Previously, this had been done. But was it assuming that the agency had the power under prior law to accomplish the substantive result? Are you telling me the agency didn't have the power to dispense with the paperwork? No. There is no clear guidance as to whether or not the agency had that power, Your Honor. Oh, my goodness. Well, these are smart people. They're pretty skilled at what they're doing, correct? Yes, Your Honor. However, this is a small benefit. But it is clear that in other instances, Congress ---- Those are regulations that are extremely intricate and detailed. Yes, Your Honor. Congress ---- Well, it involves a second filing fee, right? It involves a second filing fee, Your Honor.  Yes, Your Honor. How big was the fee? Several hundred dollars, Your Honor. Seven or several? Several. Several. I don't have the exact amount. $355, wasn't it? $355. Approximately, Your Honor. I mean, the agency might well be reluctant to remove something that Congress authorized a fee for. Yes, Your Honor. And in other contexts where Congress has allowed aliens to use priority dates between petitions, Congress has required other petitions be filed. Congress has passed ---- gone into passing a statute for other reasons. But the insignificance, as Your Honor would say, of this provision does give credence to the fact that it was not seen as a watershed changing provision. Plaintiffs tries to cite congressional history to say that there is history that ---- language that Congress meant to give credit to keep nuclear families together. Adult sons and daughters of lawful permanent residents have not been given the same treatment as derivative sons and daughters. And what plaintiffs would have you do is differentiate between the lawful ---- the sons and daughters of some lawful permanent residents over other lawful permanent residents based on how they came to the United States. Employment visas generally have shorter preference dates. An alien might be waiting years so that the ---- Well, don't we discriminate on how people came to the United States? People from China, India, Mexico, and the Philippines? Yes, Your Honor. Then we discriminate against them, right? Your Honor, that's true. We have per country quotas whether or not it's ---- or caps whether or not that's considered discrimination. Right now we look at Mexico. So today there is a limit of 1,838 F-2B visas that may be given out to Mexican nationals in a year. There's 200,000 aliens waiting for those. Today, if you're an F-2B, you have to go back to January of 92, right? For Mexico, yes, Your Honor. Yeah. And so if you got put into Category F-3, you'd have to wait. It wouldn't come up until 93. So there's a year difference. That would be currently. But under plaintiff's interpretation, the numbers would retrogress, Your Honor. And if you're an F-4, you'd have to wait until 96. Yes, Your Honor. That would further retrogress under plaintiff's interpretation. On some of these others, there's not a waiting list. All chargeability areas except those listed, they certainly have quicker dates to come up, right? Yes, Your Honor. So we're discriminating against people from China, India, Mexico, and the Philippines. Well, that's based on per country caps. And we look at the glut from Mexico actually has a lot to do with the backlog. Glut? Is that what you call it? The glut in petitions that were filed. So there was a huge number of petitions filed after legalization came about in 19, I believe, 86. And so from 1986 until the early 90s, there was a lot of people applying in F-2A for their family members. Congress specifically to take care of this backlog increased the numbers in F-2A that were available to Mexican nationals. It made it so that 75% of the F-2A numbers are not given out based on country limits. This shows Congress knows how to take care of those backlogs. It was cognizant of them when you look at the provision allowing aliens whose parents naturalized in the Philippines to opt out of automatic conversion. Congress knew how to do it, and it did not use any language here that explicitly would do that. And still, Your Honor, aliens from Mexico would still be subject to this cap. So plaintiff's interpretation doesn't take care of that theoretical 100-year backlog that they're saying exists. I said there's about 1,800 visas of F-2B given out to Mexico. Why does the statute say the purpose of subsections A, 2A, and D, the alien's petition shall automatically be converted to the appropriate category and the alien shall retain the original priority date issued upon receipt of the original petition? Well, this is referring to the original petition in this case. The only category, one of the problems with college is they look at the day of automatic conversion, and they assume on the day that a priority number becomes available to the primary beneficiary that there is a follow-on category for the aged-out derivative. There isn't. On that day, the parent is an intending immigrant who can now file an I-485. So you're telling me you don't believe in automatic conversion? The government believes in automatic conversion, but the only way, even if you say the language is clear, the only categories that can benefit under this word. So maybe every category can be considered, but you cannot benefit unless you can automatically convert to an appropriate category. Plaintiff took apart the words automatic and conversion. This isn't a conversion statute. Congress knew how automatic conversion worked in the past. You can't just assume there's a dictionary and Webster's tells you how to do this. Instead, look at since 1965, INS was putting this in its regulations, how it happened, and it's only used those words exclusively for family preference classifications that converted. When it talked about employment, it used different words. You know, I asked a prison counselor, and I don't know that I ever got a straight answer, but it is a government's position, and I don't want to put words in your mouth, that inevitably if the petitioners here get relief, somebody else's visa will get delayed. Yes. Somebody else will be put to the back of the line. Yes, Your Honor. Some other family will have to wait to be unified. Lawful permanent residents, Your Honor, who have been here for ten years will be separated longer from their sons and daughters because immigrants coming today, tomorrow, and for the next ten years will displace them with their sons and daughters. They will be changing from the F2B line. They will be hopping in front. They've been waiting longer, correct? Your Honor, they've been waiting longer as intending immigrants. They have not been waiting longer as parents separated from their children, especially as Can you talk about intending immigrants? Talks about lawful permanent residents, Your Honor, and these plaintiffs did not become lawful permanent residents until after these other people. There's no need for you to overreach and answer more than I asked. Yes, Your Honor. The point that I was asking about is this is not going to, in terms of sort of net benefit to unification of families, just as many families are going to be unified, and if these petitions get relief, it means some other family will suffer by being delayed. Yes, Your Honor. Who was entitled to more? That's a separate question, and you don't have to go there answering what I was asking. Yes, Your Honor. It's a zero-sum game. There will be so many visas. So many families are going to be unified. The question is, is it going to be this family or that family? Yes, Your Honor. There will still be only 1,838 F2B visas a year. So we avoid the policy questions then for now. Is it the government's position that both the Fifth and Second Circuit were in error and that this is an ambiguous statute? Yes, Your Honor. The government supports the BIA's interpretation. While the BIA only found one ground of ambiguity, they were only required to find one ground of ambiguity. The panel that heard this case earlier found a different ground of ambiguity. The government believes there are three. There's the fact that there's no Paragraph 2 to tell us who Paragraph 3 applies to. It's also the fact that just because all petitions could be considered under 3 doesn't mean that they all can automatically convert, which in itself is a requirement. In order to get the benefit of H3, you have to be able to technically benefit to automatically convert. And third is simply the mechanics that don't make sense when you use plaintiff's interpretation. There are so many things. What date does it automatically convert based on what petition? What if the parents don't immigrate? What if the parents do immigrate but they wait 10 years before they file the petition? There are too many questions that arise that we definitely agree is an ambiguous statute. And both the other circuits came to their determination by taking important words out of statute. Plaintiffs really would have you take out automatic conversion. They don't want you to look at what it means in regulation because that goes against them. So they pretend Congress had no idea how it had ever been used before, and instead they looked at Webster's. Webster's doesn't have a meaning for what automatic conversion means in immigration law. Could you explain to me how you want us to, at step one of Chevron, how we're supposed to interpret the statute? What's our task? At step one, we would- Is this where all this other stuff, to try to understand what the language of the statute? Well, Your Honor, where there is a term that is a term of art, such as automatic conversion, it would be proper for this Court to look at how, just as the BIA did, how automatic conversion is used, which is what the Second Circuit did. And that was all they focused on. But they looked at it and they said, looking at how this works doesn't work for them. They found that to be clear because they did not look at the broader language, such as A2A and D, which the government believes is ambiguous. But that was enough for the Second Circuit, which kind of did an end-run analysis. Well, isn't that just impracticability? Isn't that just sort of putting impracticability on it to say that it's ambiguous? I mean, if you look at, if we're supposed to look at the language here, and I'd like to see what you have to say in response to this. I mean, if the provisions of Paragraph 3 of the CSPA are triggered by Paragraph 1, why does Paragraph 3 not apply to the visa categories listed in Paragraph 2? Well, first, Your Honor, because Paragraph 3 does not say for all aliens. But it goes back to Paragraph 1. It doesn't say. Which does go to all of the categories, doesn't it? Your Honor, but it does not say for every alien considered under Paragraph 1, apply Paragraph 3. So that would be. It just sends you back to Paragraph 1, and Paragraph 1 sends you to Paragraph 2, which does cover all the categories. Is that correct? The government's position would say it sends you to the formula for the category. But you must remember under H-1 there have been interpretations that H-1 doesn't apply, Your Honor, unless you apply within one year. And none of these aliens would apply within one year because of visa availability because their parents weren't lawful permanent residents. There was no category for them to apply to. So obviously circling back and forth between these paragraphs doesn't lead us much of anywhere. That's what Congress wrote. Congress tells you to circle back and forth among the paragraphs. And, Your Honor, sometimes Congress makes a muddle of things. And it asks for – Well, you know – Maybe I shouldn't say that. Sometimes the language is unclear. It's ambiguous. It's ambiguous. I'm sorry. It's like there's a glut of Mexicans. We've got Congress not making a muddle of everything. I'm sorry, Your Honor. Just like, as you said earlier, there's a glut of Mexicans coming into this country. Congress makes a muddle of everything. So we should roll in your favor? Your Honor, I apologize if I used the – You said a glut of applications. That's what you changed it to. Anyway, that was an offensive comment. And I apologize if that's how it came across, Your Honor. Let me ask you a different question. Automatic conversion doesn't appear in other places in the statutes in the same way. But the word conversion is used throughout different sections of the immigration law. Do you take the position that it needs to be used consistently throughout the immigration law? And what is the effect of adopting your position versus adopting the petitioner's position as to the meaning of conversion? And then, of course, later you'll add automatic to it. But I'm really focusing on the term conversion. Yes, Your Honor. Conversion, as used actually in all regulations and statutes where it's used, including in the CSPA, always provides for moving from one valid visa category to a second follow-on visa category with no gap in time. Sorry, with no gap in classification. And when it does this, it's always, whenever the word conversion is used, Your Honor, it's always done this based upon the relationship with the petitioner. And so there are examples where aliens may change between different classifications based on different petitioners, but the word conversion is never used, and there's very explicit language explaining. But even in those examples, Your Honor, there is never a break in classification. And so what I mean there is in the employment categories, an alien may use a priority date from an earlier petition as long as that earlier petition was never revoked or somehow invalidated. So an alien can't come and say, I was on that visa petition. It was revoked. Now I have a new employer. I want that old priority date. You can't. There was a break in your classification under the INA, and you can't move these back and forth. Where there is no break, Congress in some cases does allow it, but it does not use the word conversion. The only time it uses conversion is in these family preference categories where people are switching back and forth based upon their relationship with the petitioner. So say it's a lawful permanent resident who naturalizes. Based on the relationship now with the citizen, the alien can convert to the follow-on category. The alien was always entitled to a prior classification, has a new classification based on the naturalization, and there is a conversion. Again, no new petition is needed, and that is how the term has consistently been used in the INA and in the regulations. Let me just change the focus for just a second here. Let's assume for a moment that our choice is between the Second Circuit and the Fifth Circuit. Everybody says, oh, this statute is really clear. The Second Circuit seems, without adopting the Wang decision, to reach the interpretation that the government wants. Is that correct? Yes, Your Honor. So the government's position is, if we find the statute is unambiguous, we should adopt the reasoning of the Second Circuit. Is that your point? Yes, Your Honor. And even if you find that it's ambiguous, you should adopt the Second Circuit. Is that also your position? You should adopt the outcome of the Second Circuit, but not the reasoning. But not the reasoning, Your Honor. Could you address, coming back to just before Judge Smith's question on the conversion, I'm still trying to understand the impact of the CFR, the 204.2A4, whatever it was. There it contemplated that there would be a second petition filed. In the regulation, Your Honor? Yes. Yes, Your Honor. Okay, and now you said there's no gap, however, in classification? Yes, Your Honor. Okay. Why is that? Because the alien is always entitled to classification based on his parent, whether or not there is a petition for it. So for a derivative who is also the son of a lawful permanent resident, the father may say, I'm just going to file for my wife and save myself $300. And so he files for the wife. The son is maybe 16, 18, whatever. A number becomes current for the son. I'm sorry, a number does not become current. The son ages out. And now, under the government's interpretation, he would automatically convert into a primary beneficiary because he was always entitled to be a primary beneficiary of an F2A petition. It's just his father saved the money for whatever reason, in case a visa number became current later. Or maybe it's a later born child, a child that's born while the petition for the wife is pending. A child doesn't have to be named as a derivative beneficiary on that petition or to be considered a beneficiary. So time passes. The child would age out. But the child always remains eligible for classification if the parent had only filed one directly for him. So he never leaves being under a category that Congress recognized. The difference for the derivatives of the other classifications who age out is that once they do age out, there is no other classification. Remember, overall, derivative classification for children is there because Congress, not that they recognize sons and daughters, I'm sorry, grandchildren of U.S. citizens. They don't. Congress hasn't recognized the relationship of U.S. citizens with nieces and nephews. They don't. But they do recognize the relationship of parents, intending immigrant parents, with their minor children. And they don't want to separate that. And so when you look at the legislative history here, Congress has said it just seems unfair that you wait. Maybe it's 20 years. Maybe it's five years. Whatever it is. And you as a child have not aged out. And now you think you're going to go with your mom and dad. And you file your paperwork. And you know what? It was taking three years or more to adjudicate I-485s. I-485s read the legislative history were really the concern, not aliens coming and visa processing. And they just said that just seems unfair. You even got your 485 in. And it's that agency taking too long. That's what the legislative history centers on. And so this is what Congress wanted to do, is keep those children to give them that benefit. But there's no language about allowing adult sons and adults, children of intending immigrants, to come with their parents. And there is that statement from Senator Feinstein, which is made a year before the CSPA is passed. But it's introducing a very generous, well, actually it's arguable. The language itself is ambiguous of the provision that Senator Feinstein put forward, the bill. But a year later, we look at the statements of the representatives who are, I think, a week or two weeks before the CSPA is effective. And they're introducing the House resolution. And what you note is that it's the House bill that formed the basis for the CSPA, not the Senate. And that the House had specifically rejected other types of provisions that would have allowed displacement of aliens, aliens jumping in line in front of other aliens. The House was very small focused. They were limited focused, really, on U.S. citizens and their children. But they tell you that we talked with the Senate, and there's three categories we brought in based on our talk with the Senate. And they explicitly outlined what those were. And those were not H-3. Those were nothing as watershed changing as what plaintiffs want this court to interpret H-3 as doing. And we cited that in our most recent brief, the language of what it was that the congressmen felt that this statute did. Do we have any sense of the numbers involved here? That is to say, if we were to adopt the plaintiff appellant's position and allow conversion from one, say, F-4 to F-2, retaining the priority date originally for the F-4, how many people would be coming into the F-2 line with the original priority date of the earlier petition? I believe, Your Honor, in our recent reply to amici that we filed, we calculated as being years. It's very hard because derivatives do not have to be named on an F-3 or F-4 petition. So the day, if the alien has not aged out, the derivative, they can just file their I-485 with the parent. So the agency doesn't have a way of knowing or tracking. But even if we assume, so in the Costello case, there were two sons, or two daughters, excuse me, who aged out. And in the Ong case, there were also two daughters. So if you consider even one alien out of ten under the F-4 category having two children who aged out, and you put that over a 10-year period when we consider how many are coming in per year, we calculate it as setting it back perhaps a decade, the priority date, if not more. And that's a conservative estimate from what the government believes. In terms of how much longer the waiting period would be for someone who's already in the F-2 line? We would say it would retrogress the priority date about a decade. Could you show the circuit petition files in here, either the second or? In both, in the second, the second circuit denied re-hearing. Is it on the circuit petition? Well, that one, we had one, effectively, so no. On the fifth circuit, I'm sorry. On the fifth circuit, we had one, effectively, so no.   And on the eighth circuit, we had one, effectively, so no. So in that decision, there were other issues also involved, and so in that case, no, Your Honor. My name is Nancy Miller, and I'm representing class action as well as co-counsel with the SORYO case. To get back to the beginning, this case is really about what does 203-H3 speak about? Who does it relate to, and who does it deal with? And for that, we deal, we look to the plain language of the statute. If I may go back, however, to your question, your first question, Judge Smith, how do we reconcile the two problems between Lee and Khalid? I think Khalid does that very well. It explains that in Lee, they never dealt with the universe of the petitions. They dealt with one section, didn't look at how three relates to two and to one, and if you just deal with three, you're absolutely right. It's ambiguous. Nobody knows what they're talking about, but if you look at all three sections, Congress made a road map, and they made a very clear road map. This sort of gives away the game for you, doesn't it? Because whether you look at one section at a time or you look at the statute as a whole, that's a judgment call as well. So why isn't the imputation that says we look at this section, we interpret it on its terms, why isn't that also a plausible interpretation if you say, you know, you just have a different way of doing it that you prefer? With all due respect, I don't believe that that's true, Your Honor. I think that the rules of statutory construction The question is how they can persuade me. I know you don't believe it's true. Good point. I think that the rules of statutory construction resolve that issue. They tell you that you don't look at a particular section in a vacuum. Okay, and where is that? What do you say to that? Khalid said it. Well, I know, but the question is do we follow Khalid? I mean, the rules of statutory construction are not like numerically, you know, you have a hierarchy that's strictly followed. Well, you have different rules of construction that courts follow in different circumstances, and sometimes when they say we look at the terms of this provision and don't look at anything else, sometimes you say, well, we've got to sort of read it in light of everything else. We've seen cases doing both things in different circumstances. Why is one superior to the other? Other than the fact that you win under one and lose under the other. And while I like that result, I recognize that that's not a good motivator. Exactly. Because you want to look at the meaning of the statute that Congress. No, I don't. No, I don't. Why don't you tell me why I do? Well, why isn't it you have a provision that deals with a specific problem, why don't we look at this provision dealing with a specific problem and do what the Second Circuit did and said, you know, this is ambiguous. It says, well, at the very least say this is one plausible way of restoring the statute and therefore it is ambiguous and we refer to the agency. There are two ways for you to lose, only one to win. Because if you look at only one section and ignore the other two sections that Congress enacted, you're not looking at the whole picture. And you do need to look at the whole picture. Why? Because that's the way to determine what Congress intended. So would you like us to adopt Khalid? Yes, I would, Your Honor. The reasoning of Khalid? Yes, I would, Your Honor. Because you think it is just right on, all the reasoning, everything. You'd love it. I think it's the best opinion you've ever read. I don't think that would be the best opinion I've ever read, but I do think it is absolutely correct. Yes, Your Honor, I do. The best non-Ninth Circuit opinion you've ever read. Oh, I'm sorry, Your Honor. I misspoke. Forgive me. I just wanted to get that straight. Oh, yes. Do you agree with the government's estimate as to the effect on the F-2 line if we were to agree with your clients? I would agree that it's difficult to make that assessment, and the reason is that there will be people who will no longer be eligible under F-2. They will have married. They will have decided that they won't be pursuing that visa. They will perhaps have immigrated under some other category. They will have decided over the course of time that they don't want to immigrate. So what's your answer to the question? Do you agree? The question is not whether you agree it's difficult. The government said it's difficult, and I don't think we are interested in knowing whether it's difficult or not, but we're interested in knowing do you agree with the government's estimate. After they said, look, it's difficult, but this is our estimate, do you agree with that estimate? Agreeing that it's difficult. Yes or no? I agree that there will be a further backlog. Exactly how much that will be, I honestly don't know. So you disagree with the 10 years? Yes. Well, because I don't know. You know, I can't say 10 years. It could be more, right? It could be more. It could be more. It could be a lot more. It could, Your Honor. So somebody who's been waiting for, let's say, 10 years, and they're about to get a visa, if we go your way, could find that they're now delayed 10 more years. Is that possible? That is possible. It is also possible that if we go the government's way, these people who still remain their parents' child and still are their son and daughter are going to be delayed their reunification for potentially 20 years or 30 years. And they have, with all due respect, been in line all of those years. They have been waiting with their parents with the hope and expectation that they would continue to be united as a family. And that simply isn't going to happen for a generation. The same is true on the other side, correct? They have hopes, too. They have families. They absolutely do. They absolutely do, Your Honor. That's true. Thank you. Thank you. Case disarguable stands submitted. We are adjourned.
judges: Kozinski, Pregerson, McKeown, Wardlaw, W Fletcher, Fisher, Gould, Paez, Rawlinson, M Smith, Murguia, Cjj